# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Nevada Resorts Association–International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada Local 720 Pension Trust, | Case No.: 2:19-cv-00499-JAD-VCF |
| Plaintiff | **Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment and Denying Defendant's Motion for Summary Judgment** |
| v. | |
| JB Viva Vegas, L.P., | [ECF Nos. 52, 53] |
| Defendant | |

When the musical *Jersey Boys* ended its run on the Las Vegas Strip, the show's producer JB Viva Vegas stopped making payments on behalf of its union stagehands into their employee-benefits plan known as the Nevada Resorts Association–International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada Local 720 Pension Trust (the Plan). The Plan determined that, under the Multiemployer Pension Plan Amendments Act (MPPAA), enacted to protect such plans from the financial hardship caused by employers' withdrawals from these benefit programs, JB was required to pay withdrawal liability to the Plan of more than $900,000. JB disagreed, and the parties submitted their dispute to arbitration. The crux of that dispute is whether JB can take advantage of an MPPAA exception that shields employers from withdrawal liability if the plan primarily covers employees in the entertainment industry. Two rounds of arbitration and numerous dispositive court rulings have resulted in an arbitrator's ruling that the Plan was right: JB is obligated to pay that withdrawal liability and can't avoid it under the entertainment exception. But the arbitrator denied the Plan's request for an award of attorney's fees.

JB and the Plan now crossmove for summary judgment.  The Plan argues that the arbitrator's award in its favor should be affirmed but his denial of its motion for attorney's fees should be vacated.[1]  JB counters that the arbitrator improperly applied the MPPAA's presumption of correctness to the Plan's interpretation of statutory language; JB's interpretation of that language, not the Plan's, is the correct one;[2] and the arbitrator's denial of fees was sound.  Because I find that the arbitrator correctly held that the Plan wasn't an entertainment one, so the entertainment exception doesn't apply, I affirm the arbitrator's summary-judgment decision in favor of the Plan.  And because federal regulations prohibit the fee-shifting agreement the Plan seeks to enforce, I affirm the denial of attorney's fees.

## Background

**A.    An employer who withdraws from an ERISA plan may be subject to withdrawal liability.**

After passing the Employee Retirement Income Security Act of 1974 (ERISA), "Congress determined that unregulated withdrawals from multiemployer plans could endanger their financial vitality and deprive workers of the vested rights" that they anticipated would be theirs when they retired.[3]  To alleviate the problem of employer withdrawals, Congress amended ERISA with the MPPAA to require employers who withdraw from multiemployer pension plans to pay withdrawal liability—the unfunded vested benefits attributable to that employer's

---

[1] *See* ECF No. 59.  While the Plan's initial motion for summary judgment appears at ECF No. 52, its summary-judgment briefing wasn't filed in accordance with local rules and was thus refiled at ECF No. 59, ECF No. 60, and ECF No. 61.  I cite to these latter briefs and exhibits throughout.

[2] ECF No. 53.

[3] *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 227–28 (1986).

participation.[4]  If an employer withdraws from a multiemployer pension plan, "the employer is liable to the plan in the amount determined" by the pension-plan sponsor,[5] who issues a determination of liability.  The employer may dispute that determination, typically through arbitration.[6]  Congress adopted these rules as a safeguard for "the solvency of private pension plans."[7]

**B.     The MPPAA's entertainment exception allows some employers to avoid withdrawal liability.**

There are a handful of exceptions to withdrawal liability.  Relevant to this dispute is the so-called "entertainment exception," which allows an employer to avoid withdrawal liability if it is contributing to "a plan for work performed in the entertainment industry, primarily on a temporary or project-by-project basis, if the plan primarily covers *employees in the entertainment industry*."[8]  I refer to this italicized portion of the entertainment exception as "the employees-in clause."  The parties call plans subject to this exception "entertainment plans."

**C.     JB and the Plan have been litigating whether the entertainment exception shields JB from withdraw liability for more than seven years.**

The parties have been fighting over whether JB owes withdrawal liability since September 2016 when the curtain came down on *Jersey Boys*, JB stopped making contributions to the Plan, and Plan demanded JB pony up nearly a million dollars.  The dispute has been twice arbitrated, resulting in awards in 2019 and 2022.

---

[4] 29 U.S.C. § 1381(a).

[5] *Id*.

[6] 29 U.S.C. § 1401(a)(1).

[7] *Connolly*, 475 U.S. at 277–28.

[8] 29 U.S.C. § 1383(c)(1) (emphasis added).

1    ***1.    The 2019 arbitration award favored JB, but the court vacated it and***
2    ***remanded for further findings on the applicability of the entertainment***
     ***exception.***

3    The arbitrator's first decision awarded summary judgment to JB after finding that the

4    Plan hadn't demonstrated that it wasn't an entertainment plan.[9]  He reasoned that the Plan

5    couldn't base its withdrawal-liability determination on data from a 2013 audit that it had

6    performed because this was "stale data."[10]  Because the Plan had "acknowledged at the time of

7    the audit that the Plan could eventually become an entertainment plan again," the arbitrator

8    concluded that it "had an obligation to conduct a fresh audit at the time *Jersey Boys* closed to

9    determine whether JB owed withdrawal liability."[11]  On review, I found that the arbitrator had

10   improperly shifted the burden of proof to the Plan[12] when the MPPAA establishes that a Plan's

11   withdrawal-liability determinations are entitled to a presumption of correctness "unless the party

12   contesting the determination" overcomes that presumption "by a preponderance of evidence."[13]

13   So I vacated that 2019 arbitration award and entered judgment in favor of the Plan.[14]

14   That decision didn't stick for long because JB moved to alter or amend that judgment,

15   arguing that I had ignored the arbitrator's alternative finding that also supported an award in its

16   favor.[15]  Indeed, the arbitrator had also concluded that "it would be unreasonable to make [JB]

17   pay withdrawal liability because JB relied on the assumption that the Plan was subject to the

18

19   ――――――――――――――――――

20   [9] ECF No. 33.

     [10] *Id.* at 5.

21   [11] *Id.*

22   [12] *Id.* at 7.

     [13] 29 U.S.C. § 1401(a)(3)(A).

23   [14] ECF No. 33 at 7.

     [15] ECF No. 43.

entertainment exception when it began making contributions in 2008," something that I didn't address in my September 2020 order.[16]  I ultimately found this alternative finding erroneous, too, because the proper time to assess the applicability of the entertainment exception was "the year JB withdrew from the Plan, not the year it joined."[17]  But I vacated my prior judgment in favor of the Plan and "remand[ed] this case back to the arbitrator to determine whether JB met its burden of proof to show that the Plan was an entertainment plan when it withdrew in 2016, and therefore whether the entertainment exception applies."[18]

### 2.  *The 2022 arbitration award favored the Plan, but the arbitrator denied its subsequent request for attorney's fees.*

The arbitrator's second award in October 2022 was a total flip-flop from the first and held that the entertainment exception didn't apply so JB couldn't rely on it to avoid withdrawal liability.[19]  To reach that conclusion, the arbitrator had to interpret and apply the exception's employees-in clause.  He found that the Plan wasn't an entertainment one because it was "covering more work in connection with[] conventions and trade shows rather than from traditional entertainment work."[20]  Data showed that, as of 2016 (when JB stopped making contributions to the Plan), "35.2% of the Plan's . . . participants earned more than half their contributions from employers in the entertainment industry, and 64.8% did not."[21]  The Plan had interpreted the employees-in clause to mean that more than 50% of Plan participants had to earn

---

[16] *Id.* at 6.

[17] *Id.* at 9.

[18] *Id.*

[19] ECF No. 53-2.

[20] *Id.* at 3–4.

[21] *Id.* at 6.

more than 50% of their earnings from entertainment-industry employers for the exception to apply.[22]  Under this more-than-50% interpretation, the Plan does not qualify as an entertainment plan within the meaning of the MPPAA, and thus the entertainment exception doesn't shield JB from withdrawal liability.[23]

JB's take on the employees-in clause adjusted the thresholds down to levels that triggered the entertainment exception.[24]  The arbitrator ultimately didn't agree that JB's interpretation of the statute was more reasonable than the Plan's.[25]  But he found that, even if he had, JB hadn't overcome the MPPAA's presumption of correctness and demonstrated that the Plan's "different conclusion was unreasonable" by "a preponderance of the evidence."[26]

With an award in its favor, the Plan moved for attorney's fees under a one-sided fee-shifting provision contained in its trust agreement.[27]  But the arbitrator denied that request for two reasons.  First, he found that it was inconsistent with federal regulations that limit the way attorney's fees can be assessed in withdrawal-liability arbitration proceedings.[28]  He alternatively found that the fee-shifting rule couldn't be enforced because it was "draconian" and "inconsistent with ERISA," it "impermissibly imposes strict liability even for good[-]faith

---

[22] *See id.* at 6, 7–8.

[23] *Id.*

[24] ECF No. 53-2 at 7–8, 11.

[25] *Id.* at 11.

[26] *Id.*  The arbitrator also found that convention and tradeshow work isn't "entertainment work," a finding that JB hasn't challenged and that is consistent with the statute.  *See* 29 U.S.C. § 1383(c)(2)(A).

[27] ECF No. 53-3.

[28] *Id.* at 7–9.

1 challenges litigated in accordance with appropriate professionalism," and "[i]ts purpose [wa]s to

2 discourage the appropriate exercise of statutory rights."[29]

3 **D.    In crossmotions for summary judgment, the parties now seek finality.**

4    The parties have returned to court with these latest awards and crossmotions for summary

5 judgment, each seeking to confirm the awards that favor them and vacate the ones that don't.

6 The Plan asks the court to affirm the arbitrator's second award and his determinations that it is

7 not an entertainment plan; the entertainment exception therefore doesn't apply to JB; and JB is

8 thus on the hook for the withdrawal-liability assessment.[30]  It also moves to vacate the

9 arbitrator's denial of attorney's fees[31] and asks that I make various rulings on findings that the

10 arbitrator made in his first merits award—an award that I vacated more than three years ago.[32]

11 JB seeks the opposite relief: vacation of the arbitrator's ruling in favor of the Plan but affirmance

12 of his no-fees decision.  JB argues that the arbitrator improperly applied the MPPAA's

13 presumption of correctness to the Plan's interpretation of statutory language and that the more-

14 than-50% approach, which the arbitrator adopted, is wrong.[33]  JB further contends that the

15 arbitrator correctly found that the Plan isn't entitled to attorney's fees for the arbitration

16 proceedings.[34]

17

18

---

19 [29] *Id.* at 9.

[30] ECF No. 59.

20 [31] *Id.* at 28–30.

21 [32] As the Plan acknowledges, the arbitrator's determinations that the Plan isn't an entertainment plan and the entertainment exception doesn't apply are dispositive.  *Id.* at 11 n.2.  And since I

22 affirm the arbitrator's second award, I need not and thus do not reach other findings he made in his first and already vacated award.

23 [33] ECF No. 52.

[34] *Id.*

**Discussion**

**A.     The court affirms the arbitrator's second award based on a de novo interpretation of the contested statutory language.**

     *1.     Burdens and presumptions in MPPAA arbitration-award review*

When reviewing an arbitration award, "the arbitrator's factual findings are presumed correct, rebuttable only by a clear preponderance of the evidence,"[35] and his conclusions of law are reviewed de novo.[36]  The MPPAA layers on one more presumption: a plan's withdrawal-liability determination "is presumed correct unless the party contesting the determination" demonstrates that it isn't "by a preponderance of the evidence."[37]  If the employer disagrees with the pension plan's withdrawal-liability determination, the onus is on the employer to prove that it was wrong.[38]

     *2.     The interpretation of the employees-in clause is the crux of the parties' dispute.*

The dispute between JB and the Plan focuses on the statutory interpretation of the employees-in clause of the entertainment exception,[39] which allows an employer to avoid withdrawal liability if the plan is one "for work performed in the entertainment industry,

---

[35] *Carpenters Pension Tr. Fund for N. Cal v. Underground Const. Co., Inc.*, 31 F.3d 776, 778 (9th Cir. 1994) (citing 29 U.S.C. § 1401(c)).

[36] *Id*.

[37] 29 U.S.C. § 1401(a)(3)(A).  While the statute states that "the party contesting the determination" must show "by a preponderance of the evidence that the determination was unreasonable or clearly erroneous," *id.*, the Supreme Court has clarified that this presumption simply shifts the burden of persuasion to the party challenging the determination.  *See Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for So. Cal.*, 508 U.S. 602, 629–30 (1993).

[38] *Id.*; *see also Concrete Pipe*, 508 U.S. at 609.

[39] 29 U.S.C. § 1383(c)(1).

8

primarily on a temporary or project-by-project basis, if the plan primarily covers employees in the entertainment industry."[40]   The parties agree that the phrase "primarily covers" means that more than 50% of plan participants must be "employees in the entertainment industry."[41]  And the statute defines "the term 'entertainment industry'" to "mean[] . . . theater, motion picture . . . , radio, television, sound or visual recording, music, and dance."[42]  But the parties' positions diverge on what it means to be *an employee in* the entertainment industry; i.e., how much entertainment-industry work one has to perform to be considered an entertainment-industry employee.

Both sides agree that an employee must have performed more than a *de minimis* amount of work in the entertainment industry to be considered an entertainment-industry employee for purposes of the exception; earning a mere cent from an entertainment-industry employer won't cut it.[43]  The parties also seem to agree that the threshold should be based on an employee's career earnings and contributions to the Plan.[44]  But they disagree about where to set that threshold.

The Plan's position is that entertainment-industry employees are those who have earned more than 50% of their income from employers in the entertainment industry.[45]  Because that was the threshold the arbitrator applied, the Plan contends that he correctly found that it used "a reasonable test for what constitutes an entertainment employee, much less than half of the Plan's

---

[40] 29 U.S.C. § 1383(c)(1).

[41] ECF No. 59 at 14; ECF No. 53 at 11.

[42] 29 U.S.C. § 1383(c)(2)(a).

[43] ECF No. 59 at 14; ECF No. 53 at 19,

[44] ECF No. 59 at 13; ECF No. 53 at 9.

[45] ECF No. 59 at 13.

1    participants qualified as entertainment employees, and thus JB must pay its withdrawal liability

2    because the entertainment exception was inapplicable."[46]

3            JB counter-proposes various thresholds, the most specific of which is either more than

4    50% percent of earnings or more than $40,000 total career earnings in the industry.[47]  JB

5    alternatively suggests that an employee earning "more than an insignificant amount" from an

6    entertainment-industry employer would do the trick as well.[48]  According to JB, these options

7    represent more common-sense and reasonable approaches than the one the Plan proposes.[49]  It

8    also argues that the arbitrator erred in applying the MPPAA's presumption of correctness to the

9    Plan's interpretation of statutory language.[50]

10

11       ***3.       The employees-in clause is ambiguous, so the tenets of statutory
              construction must be applied.***

12           This dispute over the interpretation and application of the employees-in clause makes one

13    thing very clear: this statutory provision is ambiguous.  Sure, the MPPAA defines what type of

14    work is considered entertainment-industry work, but it doesn't clarify how much of one's work

15    has to be entertainment-industry work for the employee to be considered one in the entertainment

16    industry.  And neither party has identified any Supreme Court or Ninth Circuit cases interpreting

17    this particular phrase in the MPPAA.  So this court must turn to the rules of statutory

18    construction to divine the meaning of this key language.

19

20

---

21   [46] *Id.* at 10 (cleaned up).

    [47] ECF No. 53 at 19.

22   [48] *Id.* at 9.

23   [49] *Id.* at 14.

    [50] *Id.* at 9, 18.

1               ***a.***      ***A plain-language construction is no help.***

2         "It is well settled that the starting point for interpreting a statute is the language of the

3 statute itself."[51]  If the statutory language is "plain and unambiguous," the court must enforce it

4 "according to its terms."[52]  JB does at various points assert that the plain language of the statute

5 should control, but these arguments are more focused on the statute not explicitly including the

6 50% threshold that the Plan advances[53] or its position that no deference should be given to a

7 plan's interpretation of statutory language.[54]  To the extent that JB is contending that the

8 employees-in clause has a plain and unambiguous meaning, it undermines this argument by

9 highlighting and advocating for a wide range of possible interpretations, several of which are

10 themselves ambiguous.[55]  In short, there must be some way to determine whether someone is an

11

12

[51] *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1083 (9th Cir. 2019)
13 (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987))
(cleaned up).

14 [52] *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (citing *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009); *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009)).

15 [53] *See* ECF No. 53 at 17.

16 [54] *Id.* at 13.  These cases all involved the use of improper interest rates and are all distinguishable
because the Plan here didn't ignore statutory requirements like the plans involved in those cases
17 did.  *See United Mine Workers of Am. 1974 Pension Plan v. Energy W. Mining Co.*, 39 F.4th
730, 740 (D.C. Cir. 2022) (interest rate didn't account for plan's characteristics despite clear
18 statutory language requiring that it do so); *GCIU-Emp. Ret. Fund v. MNG Enters., Inc.*, 51 F.4th
1092, 1099 (9th Cir. 2022) (same); *Sofco Erectors, Inc. v. Trs. of Ohio Operating Eng'rs
19 Pension Fund*, 15 F.4th 407, 421 (6th Cir. 2021) (same).  It just has a different interpretation of
ambiguous statutory language than JB's.

20 [55] *See* ECF No. 53 at 9 (theorizing that "any employee that earns more than an insignificant
amount of their earnings from entertainment[-]industry employers is an" entertainment-industry
21 employee); *id.* at 12 (arguing that "something less" than primarily or substantially is sufficient);
*id.* at 16 (arguing that earning "more than 50% or at least $40,000 of . . . career earnings" is one
22 of several "reasonable standards"); ECF No. 55 at 8 (stating that "any work in the entertainment
industry may be enough" under the statute); *id.* at 9 (noting that while it isn't arguing "that once
23 an employee earns one cent such employee is working in the entertainment industry for life . . .
statutory language could support such an assertion").

1 entertainment-industry employee, and the statute doesn't expressly provide one.  So a plain-

2 language reading gets us nowhere.

3               **b.        The employees-in clause must be narrowly construed.**

4        "The purpose of statutory construction is to discern the intent of Congress in enacting a

5 particular statute."[56]  When the meaning of statutory language is unclear, the court "may [also]

6 use canons of construction, legislative history, and the statute's overall purpose to illuminate

7 Congress's intent."[57]  Such sources indicate that the entertainment exception should be construed

8 narrowly.

9        A committee report on the MPPAA directly states as much, noting that the goal of this

10 exception was to "narrowly limit[]" withdrawal liability for entertainment-industry employers.[58]

11 This exception is rooted in the expectation that entertainment-industry employers withdrawing

12 from entertainment plans "may not eliminate jobs from a plan's contribution base."[59]  Indeed, the

13 Ninth Circuit has "recognized the centrality of the contribution base in applying the

14 construction[-]industry exception to MPPAA withdrawal liability."[60]  And the entertainment

15 exception was included in the MPPAA because Congress believed that "[c]ertain portions of the

16 entertainment industry have characteristics similar to the construction industry, in that work is

17

18

19 _____

[56] *Pac. Coast Fed'n of Fishermen's Ass'ns*, 945 F.3d at 1083 (quoting *Robinson v. United States*,
20 586 F.3d 683, 686 (9th Cir. 2009)).

[57] *Id*. at 1084 (quoting *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1133 (9th Cir. 2009)) (alteration in
21 original).

22 [58] H.R. Rep. 96-869, pt. 2, at 15 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2993, 3004.

[59] *Id.*
23
[60] *Resilient Floor Covering Pension Tr. Fund Bd. of Trs. v. Michael's Floor Covering, Inc.*, 801
F.3d 1079, 1088 (9th Cir. 2015).

performed on a project basis with little continuity of employment or employers."[61]  So the legislative history tells us that the exception should be construed narrowly, with an eye towards its underlying reasoning—that an employer's exit from entertainment plan wouldn't have a substantial impact on a plan's contribution base given the transitory nature of employment in that industry.

The MPPAA's overall purpose also cautions a narrow reading of this contested language. "Congress passed the MPPAA to protect multiemployer pension plans from adverse consequences that resulted when individual employers terminated their participation in, or withdrew from, multiemployer plans."[62]  At the time, a "'significant number of multiemployer plans were experiencing extreme financial hardship' as a result of individual employer withdrawals from the plans, which saddled the remaining employers with increased funding obligations."[63]  "These withdrawals caused a domino effect of cascading additional withdrawals that eventually 'could have resulted in the termination of numerous plans,'" and this, "in turn, could have jeopardized the entire [Pension Benefit Guaranty Corporation] insurance program."[64]

A broad interpretation of the entertainment exception would be inconsistent with the MPPAA's purposes of protecting plans and their participants from potential deleterious effects that employer withdrawals have and disincentivizing "cascading additional withdrawals" after an

---

[61] H.R. Rep. 96-869, pt. 1, at 76 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2944; *see also id.* at 68, *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2936 (observing that "certain entertainment industries . . . share to an extent the characteristics of work of a temporary project nature and mobility of employment that limits the impact on a plan of a cessation of contributions by an employer").

[62] *Heavenly Hana LLC v. Hotel Union & Hotel Indus. of Hawaii Pension Plan*, 891 F.3d 839, 845 (9th Cir. 2018) (quoting *Resilient Floor*, 801 F.3d at 1088) (cleaned up).

[63] *Resilient Floor*, 801 F.3d at 1088 (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 721 (1984)) (cleaned up).

[64] *Id.* (quoting *R.A. Gray & Co.*, 467 U.S. at 721).

1  employer exits a plan.  A narrower interpretation is also consistent with the general principle of

2  construction that remedial statutes like "ERISA (and the MPPAA) . . . should be liberally

3  construed in favor of protecting the participants in employee benefit plans,"[65] while their

4  exceptions should be narrowly construed.[66]  So the MPAAA's legislative history and purpose, as

5  well as canons of statutory construction, favor a narrow interpretation of the entertainment

6  exception.

7

8         *c.*      ***The thresholds that JB proposes are inconsistent with the MPPAA's legislative history and purpose.***

9        The thresholds that JB advocates are inconsistent with the purpose of the MPPAA, the

10  reasoning behind its entertainment exception, and Congress's desire that the exception be

11  construed narrowly.  JB first proposes that the employees-in clause be construed to mean anyone

12  with $40,000 in career earnings or anything "more than an insignificant amount of . . .

13  earnings."[67]  The $40,000 threshold appears to be an entirely arbitrary number as JB doesn't

14

---

15  [65] *Heavenly Hana*, 891 F.3d at 845 (quoting *IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)).

16  [66] *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 381 (1977) (Marshal, J., concurring

17  in part) ("[U]nder longstanding principles of statutory construction, [remedial acts] should 'be given a liberal interpretation . . . (and) exemptions from [their] sweep should be narrowed and

18  limited to effect the remedy intended." (quoting *Piedmont & Northern R. Co. v. ICC*, 286 U.S. 199, 311–12 (1932)); *see also Union Asphalts & Roadoils, Inc. v. MO-KAN Teamsters Pension

19  *Fund*, 857 F.2d 1230, 1234 (8th Cir. 1988) (the term "building and construction industry" from MPPAA should be construed narrowly because it "is part of a statutory exception").

20  [67] JB's view is that an employee performs "more than an insignificant amount" of work in the entertainment industry so long as more than 5% of his earnings come from entertainment-

21  industry employers.  *See* ECF No. 53 at 13 (stating that "70.2% of the Plan's participants perform more than in insignificant amount of work for entertainment employers") (cleaned up);

22  *id.* at 14 (noting that 70.24% of [Plan] participants earned at least 5% of their wages from entertainment employers") (cleaned up).  The similar threshold of "no more than an insubstantial

23  portion of [an employer's] work" is found elsewhere in the MPPAA.  *See* 29 U.S.C. § 1388(d). But the act doesn't define this threshold either, and no court has interpreted it to set one.  *See, e.g.*, *Sofco*, 15 F.4th at 427 (musing on what an "insubstantial portion" threshold would be under

identify any source for it, and adopting it would lead to absurd results.  For example, someone who earned $40,000 doing entertainment work more than a decade ago but hasn't worked an hour for an entertainment employer during the past ten years would still be an employee in the entertainment industry under this interpretation.  The "more than an insignificant amount" threshold would likewise result in broad inclusion.  Under that interpretation, a plan could be deemed an entertainment plan when half of its participants performed no entertainment-industry work whatsoever and the other half spent the majority of their time working in other fields.

Construing the employees-in clause to require a higher threshold than JB proposes better fosters the purpose behind the entertainment exception, too.  The exception reflects the reality that, because entertainment-industry jobs are highly transitory, an employer's withdrawal from an entertainment plan "may not eliminate jobs from a plan's contribution base"[68] because workers can be expected move to "other signatory employers" from the plan who will "take up the slack" caused by the departure.[69]  And the more rooted an employee is in the entertainment industry, the more likely he is to transition quickly into another entertainment-industry job when his gig ends.  So setting the threshold at more than 50% better captures the employers, employees, and plans that Congress had in mind.

### d.    *JB's arguments against a more-than-50% threshold are unpersuasive.*

In addition to proposing its own thresholds, JB argues that an interpretation of the employees-in clause with a more-than-50-percent threshold is wrongheaded, but I find none of its arguments persuasive.  JB contends that this threshold "is not even rational" because there

---

the act but ultimately remanding the case for further proceedings without reaching what fixed percentage could be attributed to the term—or whether one even could be).

[68] H.R. Rep. 96-869, pt. 2, at 15 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2993, 3004.

[69] *H.C. Elliott, Inc.*, 859 F.2d at 812.

would be certain instances in which individuals with substantial entertainment-industry earnings would not be considered entertainment-industry employees.[70]  It similarly argues that "[i]t is common sense that an employee that works 49.9% in a theater is no less an employe[e] in the entertainment industry than an employee that works [] 50.1% of the time in a theater."[71]  But JB agrees that the employees-in clause has to impose some earnings threshold and concedes that it would be "unreasonable" to argue otherwise.[72]  And as discussed above, its proposals would deem as entertainment plans ones in which not a single participant spends the majority of their time working in the industry.  That result is less reasonable and farther from the MPPAA's purpose and remedial nature.

JB also reasons that Congress's failure to set an explicit threshold suggests that Congress didn't intend for "there to be any sort of minimum amount of work requirement."[73]  But JB undermines its own theory when it then concedes that it would be "unreasonable" to conclude that "once an employee earns one cent such employee is working in the entertainment industry for life," and JB clarifies that it is not arguing that there should be no minimum requirement.[74]

Finally, JB contends that Congress's failure to use "primarily" or "substantially all" in the statute following the term "employees" and preceding the phrase "in the entertainment industry" suggests that Congress "made the decision that something less would be sufficient to determine that an employee is performing work in the industry."[75]  Those terms are used in other portions

---

[70] ECF No. 53 at 19; ECF No. 55 at 9.

[71] ECF No. 55 at 8.

[72] *Id.* at 19.

[73] ECF No. 53 at 17.

[74] *Id.* at 19; ECF No. 55 at 7, 9.

[75] ECF No. 53 at 12, 17.

1    of the statute,[76] and in JB's view, the absence of these terms in the employees-in clause means

2    that "an employee 'in the entertainment industry' is something more than an employee who earns

3    one cent from an Entertainment Employer, but something less than an employee who earns more

4    than 50% of his wages from an Entertainment Employer."[77]   As JB acknowledges, however, the

5    MPPAA does use a lower, "insubstantial portion" threshold elsewhere in the Act.[78]   Congress

6    therefore knew how to set a threshold lower than "substantially all" and "primarily" but didn't

7    see fit to do so in the employees-in clause.  So the absence of an explicit threshold just makes the

8    statute ambiguous.

9                                              *   *   *

10           In sum, JB's arguments against the more-than-50% threshold are at some points

11   contradictory and ultimately all unpersuasive.  And JB doesn't dispute the arbitrator's factual

12   finding that the Plan didn't primarily cover employees who earned at least 50% of their income

13   from entertainment-industry employers.[79]  So I affirm the arbitrator's finding that the Plan was

14   not an entertainment plan in 2016 and his grant of summary judgment in the Plan's favor.

15

16   **B.    The arbitrator correctly found that the Plan isn't entitled to attorney's fees
           incurred for work related to the arbitration proceedings.**

17           While the arbitrator's ultimate ruling favored the Plan, he denied the Plan's request for an

18   award of attorney's fees.[80]   The Plan requests that this court vacate that ruling and award it

19

20   _____
     [76] *See* 29 U.S.C. §§ 1383(b)(1)(A) and (d)(2) ("substantially all"); 29 U.S.C. §§ 1383(b)(1)(B)(i),

21   (c), and (d) ("primarily").

     [77] ECF No. 53 at 18; *see also supra* note 67.

22   [78] *Id.* at 17.

23   [79] ECF No. 53 at 15.

     [80] ECF No. 53-3.

$142,962 in fees.[81]  It argues that "JB agreed to be bound by the rules of the Plan" and that one of those rules is "that should a withdrawing employer [unsuccessfully] challenge the Plan's withdrawal liability assessment" it "shall pay the attorney's fees incurred by the Plan as a result."[82]  Indeed, the Plan's trust agreement and its rules and regulations—both of which JB agreed to be bound by[83]—lay out that contested rule in a subsection subtitled "Attorney's Fees and Costs of Arbitration":

> In addition to any shifting of fees and costs provided by the applicable arbitration rules, any Employer that initiates an arbitration regarding a withdrawal liability assessment and which, at the conclusion of such arbitration, has not been relieved of all such liability, shall pay the reasonable attorney's fees and costs incurred by the Plan in relation to such arbitration proceeding.[84]

JB responds that the arbitrator correctly found that this fee-shifting rule doesn't comply with applicable regulations and is thus unenforceable.[85]  According to JB, federal regulations establish certain procedures in MPPAA arbitrations that can't be modified; one of them is the way attorney's fees are awarded.[86]  Since the arbitrator's finding here turns on his interpretation of regulations, I review it de novo.[87]

---

[81] ECF No. 52 at 30.

[82] ECF No. 59 at 28.

[83] *Id.* at 4.

[84] ECF No. 59-2 at 26; ECF No. 59-6 at 2.

[85] ECF No. 55 at 15.  The arbitrator alternatively found the Plan's fee-shifting rule to be unreasonable, but I need not and thus do not reach that issue.

[86] *Id.* at 15–18.

[87] *Carpenters Pension*, 31 F.3d at 778 (citing 29 U.S.C. § 1401(c)).

1

2

  **1.**  ***Arbitration regulations governing withdrawal-liability disputes allow the arbitrator to award attorney's fees only when there's bad faith or improper conduct.***

3    Created by the Employee Retirement Income Security Act of 1974 (ERISA), the Pension

4 Benefit Guaranty Corporation (PBGC) is a federally chartered entity that insures benefit pension

5 plans.[88]  The PBGC has promulgated regulations that "establish procedures for" arbitrating

6 "withdrawal-liability disputes."[89]  But parties may also use "an alternative arbitration procedure

7 approved by the PBGC" in lieu of the procedures established by regulation.[90]  If an alternative-

8 arbitration procedure is used, that procedure "shall govern all aspects of the arbitration" except

9 for five areas in which the regulations must be strictly followed.[91]  One such exception is

10 described in 29 C.F.R. § 4221.14(b)(5) and provides that "[t]he costs of arbitration shall be

11 allocated in accordance with § 4221.10."[92]  In turn, § 4221.10, titled "Costs," establishes how

12 "the costs of arbitration under this part shall be borne by the parties."[93]  It covers three distinct

13 categories of "costs": "[w]itnesses," "[a]ttorneys' fees," and "[o]ther costs of arbitration."[94]  And

14 it gives the arbitrator discretion to award attorney's fees only when a party "initiates or contests

15 an arbitration in bad faith or engages in dilatory, harassing, or other improper conduct during the

16 course of the arbitration."[95]  So, to summarize:

17

18

---

[88] *Connolly*, 475 U.S. at 214.

[89] 29 C.F.R. § 4221.1 (cleaned up).

[90] *Id.* at § 4221.14(a).

[91] *Id.* at § 4221.14(b).

[92] *Id.* at § 4221.14(b)(5).

[93] *Id.* at § 4221.10.

[94] *Id.* at § 4221.10(a)–(c).

[95] *Id.* at § 4221.10(c).

- arbitrating parties can't deviate from PBGC arbitration regulations related to costs;

- attorney's fees are a type of arbitration cost under the regulations: and

- the regulations allow a discretionary award of attorney's fees only against a party that has engaged in bad faith or other improper conduct.

### 2. *The arbitrator correctly concluded that the federal regulations preclude an attorney's fee award here.*

While the trust agreement entitles the Plan to an award of attorney's fees and costs for these withdrawal-liability arbitration proceedings, 29 C.F.R. § 4221.14(b)(5) cancels that provision out and bars such an award here.[96]  The Plan's arguments to the contrary are unpersuasive.  It contends that § 4221.14(b)(5) only establishes "how '*[t]he costs of arbitration shall be allocated*' . . . not the completely different subject matter of 'attorney's fees.'"[97]  But attorney's fees are defined as a "cost" under this regulation, so the regulation does govern attorney's fees, too.[98]

---

[96] Persuasive is *Irigaray Dairy v. Dairy Emps. Union Loc. No. 17 Christian Lab. Ass'n of the United States of Am. Pension Tr.*, 153 F. Supp. 3d 1217, 1253 (E.D. Cal. 2015), in which a California district court considered a similar provision in a trust agreement that would render the plaintiffs liable for all of the defendants' costs and attorney's fees should the defendants prevail. The *Irigaray* court found that this provision was "not consistent with applicable regulations" that established that "Plaintiffs should be assessed half of the costs (unless the arbitrator determines otherwise), and that [attorney's] fees should be granted upon a determination that a party engaged in bad faith or other improper conduct." *Id.* (citing 29 C.F.R. § 4221.10).  Because the trust agreement's fee-shifting provision "violate[d] federal regulations," the court refused to enforce it and further clarified that the plaintiffs could only be assessed the defendants' attorney's fees upon a "determination of the arbitrator to award fees . . . governed by, and to be made in compliance with, the provisions of section 4221.10." *Id.*

[97] ECF No. 59 at 29.

[98] 29 C.F.R. § 4221.10.

The few cases the Plan relies on are materially distinguishable.  For example, it cites to *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, for the general proposition that an employer must abide by the terms of a trust agreement.[99]  But that case didn't establish that an arbitrator must apply a trust provision that contravenes federal regulations.  The Plan's reliance on *Bowles v. Quantum Chem. Co.* is likewise misplaced.[100]  It focused an individual employee's action under ERISA to recover severance benefits, and it didn't involve withdrawal liability, the MPPAA, or arbitration at all.  And while the *Bowles* court did find that the employer was contractually required to pay the employee's attorney's fees, there wasn't a federal regulation prohibiting that award.[101]

The Plan also argues that the American Arbitration Association (AAA) rule governing attorney's fees for withdrawal-liability arbitrations indicates that an arbitrator can award attorney's fees without a finding of bad faith.[102]  Even if this is a correct interpretation of that AAA rule, it, too, would be an improper alternative-cost-assessment procedure under § 4221.14(b)(5).  The rule even cites § 4221.14(b)(5) immediately after the statement that an arbitrator "may assess reasonable attorney's fees," which suggests that the AAA regards attorney's fees as a type of "cost" within the meaning of these regulations because § 4221.14(b)(5) only uses the term "costs" and not "attorney's fees."

---

[99] *Id*. at 28 (citing *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559 (1985)).

[100] *Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 636 (7th Cir. 2001).

[101] *Id.*  This case at most suggests that, in some circumstances, parties may contract around ERISA's fee-shifting provision, 29 U.S.C. § 1132(g)(1).  But 29 C.F.R. § 4221.14(b)(5) expressly prohibits MPPAA-arbitration parties from doing that with the attorney's-fees provision at issue here, 29 C.F.R. § 4221.10(c).

[102] *See* ECF No. 59 at 29–30; ECF No. 61 at 16–17.

1   Finally, the Plan highlights that the attorney's fees subsection of § 4221.10 says that the

2   arbitrator "may" award attorney's fees upon a finding of bad faith or improper conduct, while the

3   term "shall" is used alongside the term costs in this and other related regulations.[103]  The Plan

4   argues that these are "two very distinct terms and levels of permissiveness when it comes to

5   referring to costs and fees" and that "[t]o find that these two words mean the same thing" ignores

6   basic principles of statutory construction.[104]  But the arbitrator didn't find that "costs" and

7   "attorney's fees" mean the same thing.  He merely found, as I do here, that attorney's fees are a

8   type of arbitration cost under § 4221.14(b)(5) and § 4221.10, and that the Plan can't devise

9   alternative procedures for assessing attorney's fees beyond those contained in § 4221.10 because

10  doing so would violate § 4221.14(b)(5).  Plus the fact that an arbitrator is not required to award

11  attorney's fees upon a finding of bad faith or improper conduct doesn't somehow open the door

12  for the Plan to establish its own fee-shifting rules.[105]  The critical "shall" here is in

13  § 4221.14(b)(5), and its use in that regulation establishes that § 4221.10 provides a closed

---

17  [103] ECF No. 59 at 28–29.

18  [104] *Id.* at 29.

19  [105] Another problem with the Plan's position is that this fee-shifting rule isn't a PBGC-approved
20  alternative procedure.  The arbitration in this case was conducted under AAA rules that were
    approved by the PBGC.  *See* ECF No. 61-13.  But the Plan doesn't identify any AAA rule that
21  provides for one-sided fee shifting or indicates that parties can contractually agree to such an
    arrangement.  This fee-shifting provision appears only in the Plan's trust agreement and rules
22  and regulations.  So even if the Plan's fee-shifting provision wasn't barred by §§ 4221.10 and
    4221.14(b)(5), it still wouldn't be enforceable because it doesn't appear in the PBGC-approved
    rules that this arbitration was performed under.  *See* 29 C.F.R. § 4221.14(a) (establishing that
23  parties can deviate from the arbitration procedures outlined in the regulations when they follow
    "an alternative arbitration procedure *approved by the PBGC in accordance with paragraph (c) of
    this section*." (emphasis added)).

universe in which an arbitrator must operate when it comes to assessing attorney's fees and other "costs" in withdrawal-liability arbitrations.[106]

In short, the arbitrator correctly found that 29 C.F.R. §§ 4221.14(b)(5) and 4221.10 allowed him to award attorney's fees only upon a showing of bad faith or improper conduct—which nobody disputes was absent here.  So I affirm the arbitrator's finding that the Plan isn't entitled to an award of attorney's fees for the arbitration proceedings.

## Conclusion

IT IS THEREFORE ORDERED that the Plan's motion for summary judgment **[ECF No. 52] is GRANTED IN PART and DENIED IN PART.**  I affirm the arbitrator's second award and grant of summary judgment in favor of the Plan but decline to vacate the arbitrator's denial of the Plan's request for attorney's fees.

IT IS FURTHER ORDERED that JB's motion for summary judgment **[ECF No. 53] is DENIED.**

**The Clerk of Court is directed to ENTER JUDGMENT accordingly and CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
March 29, 2024

---

[106] The Plan also notes that 29 U.S.C. § 1401(a)(2) "simply say[s] '[t]he arbitrator may award reasonable attorney's fees.'"  ECF No. 59 at 30; ECF No. 61 at 17.  But that subsection also states that any arbitration "shall be conducted in accordance with the fair and equitable procedures to be promulgated by the" PBGC, *id.* at § 1401(a)(2), which would include §§ 4221.10 and 4221.14(b)(5).